Thomas J. SPARGO, Jane McNally, and Peter Kermani, Plaintiffs,

v.

NEW YORK STATE COMMISSION ON JUDICIAL CONDUCT, Gerald Stern, individually and as Administrator of the State Commission on Judicial Conduct, and Henry T. Berger, individually and as Chairperson of the New York State Commission on Judicial Conduct, Defendants.

No. 1:02–CV–1320.

United States District Court, N.D. New York.

Feb. 20, 2003.

DeGraff Foy Holt–Harris & Kunz, LLP, Albany, NY (David F. Kunz, of counsel), for Plaintiffs.

Eliot Spitzer, Attorney General for the State of New York, Syracuse, NY (Patrick Macrae, Esq., Senta Suida, Esq., Ass't Attorneys General, of counsel), for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. THE PARTIES

Plaintiff Thomas J. Spargo ("Spargo") is currently a Supreme Court Justice for the Third Judicial District of the State of New York. He was an attorney in private prac- tice specializing in election law before his foray into elective politics. In the fall of 1999 Spargo campaigned for election to the position of Town Justice for the Town of Berne, in Albany County, New York. He was elected and assumed that position on January 1, 2000. In 2001 Spargo, a Re- publican, campaigned for election to his current position. He was cross-endorsed by the Democratic, Independence, and Conservative Parties. His campaign was successful and he assumed his current po- sition on January 1, 2002.

Plaintiff Jane McNally ("McNally") is a recently retired public service employee. She is a life-long Democrat and has been active in campaigns as well as party affairs for many years. McNally became ac- quainted with Spargo in the late 1980's in the course of his work regarding highly contested Democratic primary challenges. Spargo and McNally worked together fre- quently regarding political activities. In 2001, McNally worked with Spargo on his campaign for election to Supreme Court Justice. McNally was a delegate to the Democratic Party nominating convention that year, and she nominated Spargo for endorsement by her party. The nomina- tion was successful and he was cross-en- dorsed.

Plaintiff Peter Kermani ("Kermani") is the chairperson of the Albany County Re- publican Party. He supported Spargo's candidacies. He indicates that he would like to invite Spargo or other judicial can- didates or judicial officers to speak to his organization but feels constrained not to do so because it may subject them to sanctions.

Defendant Gerald Stern is the Adminis- trator of the New York State Commission on Judicial Conduct ("Commission"). The administrator is a member of the bar who is appointed by the Commission and serves at its pleasure. N.Y. Jud. L. § 41(7)

(McKinney's 2002). Defendant Henry T. Berger is the chairperson of the Commission.

## II. *PROCEDURAL HISTORY*

Spargo, McNally, and Kermani filed the complaint in this matter pursuant to 42 U.S.C. § 1983 challenging the facial and as applied constitutionality of certain sections (as described in detail below) of the New York Code of Judicial Conduct and seeking declaratory and injunctive relief. Plaintiffs' allegations stem from a Formal Written Complaint dated January 25, 2002 ("Complaint"), and a Supplemental Formal Written Complaint dated May 13, 2002 ("Supplemental Complaint"), brought against Spargo by Stern in his capacity as Administrator and Counsel to the Commission. Essentially plaintiffs allege that certain sections of the Code of Judicial Conduct infringe upon their free speech, association, and equal protection rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution.

A hearing on the charges set forth in the Complaint and the Supplemental Complaint was set to begin on October 21, 2002, and continue to October 24, 2002, as agreed by the parties. In early October Spargo sought a change of venue for the hearing from New York City to Albany. The Commission did not oppose; therefore, venue was changed to Albany. As a result, the assigned Referee withdrew. A new Referee was designated on October 8, 2002. On October 10, 2002, Spargo requested an adjournment until December 2002. The Referee denied the request, indicating that the hearing would occur as scheduled. On October 15, 2002, Spargo renewed his request for an adjournment.

Plaintiffs filed this action on October 17, 2002.

On October 17, 2002, an Order to Show Cause with Temporary Restraining Order signed by Hon. Lawrence E. Kahn, United States District Judge, was filed. The Temporary Restraining Order enjoined defendants from taking any action with respect to the Complaint and Supplemental Complaint. A hearing was set down for October 23, 2002, to entertain plaintiffs' motion for a preliminary injunction. The hearing was changed to October 25, 2002, upon random assignment to the undersigned. On October 25, 2002, the Temporary Restraining Order was extended by consent of the parties. Plaintiffs' motion for a preliminary injunction was set down for a hearing on November 29, 2002. An Order was issued on November 7, 2002, advancing and consolidating trial of the action on the merits with the hearing of plaintiffs' application for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a). The parties were given an opportunity to object to the advancement and consolidation; however, no objections were made.

Plaintiffs' submissions in support of their motion for a preliminary injunction were filed at the time the action was initiated. Defendants filed opposition to the motion for a preliminary injunction. Plaintiffs then filed a list of proposed witnesses and exhibits for the consolidated trial. Plaintiffs also filed a reply memorandum of law in further support of their motion, along with twelve affidavits. Defendants objected to plaintiffs' presentation of witnesses at the trial. Defendants further moved in limine to preclude consideration of the twelve reply affidavits.

Plaintiffs reply affidavits were accepted.[1] However, plaintiffs were precluded from

---

1. It was noted that although the affidavits were accepted as a part of the record, many

relate to the merits of the charges against

presenting testimony at the trial upon a finding that no facts were in controversy and the matter for decision was one strictly of law that could be decided upon the submissions.

Oral argument was heard on November 29, 2002, in Utica, New York. Decision was reserved.

## III. BACKGROUND

### A. Development of the Code of Judicial Conduct

The American Bar Association ("ABA") adopted the first Canons of Judicial Ethics in 1924. Jeffrey M. Shaman, et al., *Judicial Conduct and Ethics* § 1.02 (3d ed.2000). These original Canons were meant as an "ideal guide of behavior, rather than an enforceable set of rules." *Id.* There was no method of enforcement unless each state adopted one. By constitutional amendment in 1947, New York created a special Court on the Judiciary to hear cases of judicial misconduct or disability, and to mete out sanctions. *Id.* § 1.03. The only sanction available to the Court on the Judiciary was removal. *Id.* The Court on the Judiciary met for the first time in 1959, twelve years after it was created. *Id.* While apparently creating a mechanism for enforcement of the Canons of Judicial Ethics, it was ineffective in doing so.

In 1972 the ABA promulgated the Model Code of Judicial Conduct in order to specify mandatory and enforceable rules for judicial comportment. *Id.* § 1.02. The New York State Bar Association adopted the ABA Model Code in 1973, with some amendments. Marjorie E. Gross, *Updated*

*Rules on Judicial Conduct,* 215 N.Y. L.J. 1 (May 14, 1996). Judges' conduct was also governed by the Rules Governing Judicial Conduct of the Chief Administrator of the Courts, 22 NYCRR Part 100. *Id.* There was still no effective mechanism for investigating and sanctioning misconduct.

In 1977, the New York State Constitution was amended to establish a Commission on Judicial Conduct ("Commission") to receive, initiate, investigate, and hear complaints regarding the conduct, qualifications, and performance of judges within the unified court system.[2] N.Y. Const. Art. 6 § 22 (McKinney's 2001 & Supp. 2003). This was the first effective mechanism in New York State to investigate complaints of misconduct against judges.

In 1990 the ABA promulgated the Revised Model Code of Judicial Conduct, revising some specific details and adding new specific details. *Judicial Conduct and Ethics, supra,* § 1.02. New York adopted a combination of the 1972 and 1990 ABA Model Codes, *id.,* which became effective in 1996, Gross, *supra.*

The current New York Code of Judicial Conduct as adopted by the New York State Bar Association, comprised of five general canons of conduct along with specific rules under each canon, is set out in an appendix to the Judiciary Law, McKinney's Book 29. It is also set forth in Part 100 of the Rules of the Chief Administrator of the Courts, found in McKinney's New York Rules of Court, and is codified in Title 22 of the Official Compilation of Codes, Rules & Regulations of the State of New York.[3]

---

Spargo and therefore are irrelevant to the issues of law presented.

**2.** At the same time, the section that established the Court on the Judiciary was re-

pealed. N.Y. Const. Art. 6 § 22 Historical Notes (McKinney's 2001).

**3.** The Code of Judicial Conduct, Judicial Conduct Rules of the Chief Administrator of the Courts, and Title 22 of the Official Compila-

## B. *The Commission on Judicial Conduct*

The Commission is made up of eleven appointed members. N.Y. Jud. L. § 41 (McKinney's 2002). The initial members were appointed to terms varying from one to four years. *Id.* Thereafter, the member's terms were four years. *Id.* A combination of members of the bar, judges, and non-members of the bar comprise the Commission. *Id.* The Commission is authorized and directed to adopt rules to carry out its duties.[4] *Id.* § 42.

Available sanctions include admonishment, censure, and removal from office "for cause, including, but not limited to, misconduct in office, persistent failure to perform his [or her] duties, [and] habitual intemperance and conduct, on or off the bench, prejudicial to the administration of justice." *Id.* § 44(1). A judge may also be "retired for mental or physical disability preventing the proper performance of his judicial duties." *Id.* Further, a judge may be suspended from office by the Court of Appeals upon its own motion or a recommendation by the Commission. *Id.* § 44(8).

The Commission may initiate an investigation based upon receipt of a written and signed complaint from an external source. *Id.* § 44(1). However, if it is determined that the complaint lacks merit on its face, it may be dismissed. *Id.* The complainant is always notified of the disposition. *Id.* § 44(11).

The Commission may also, on its own initiative, initiate an investigation with the filing of a complaint. *Id.* § 44(2). In the course of its investigation and hearing of a complaint (initiated either internally or externally), the Commission may "administer oaths or affirmations, subpoena witnesses, compel their attendance, examine them under oath or affirmation and require the production of any books, records, documents or other evidence that it may deem relevant or material to an investigation." *Id.* § 42. During the investigation or hearing, if the Commission finds that other action is warranted, such as referral to a district attorney's office, it must refer the complaint or allegations along with supporting evidence to the appropriate authority. *Id.* § 44(10).

The Commission may designate a panel of three of its members or a referee, who is a member of the bar but not a member of the Commission, to carry out its duties. *Id.* § 43. A panel may perform any of the functions and duties of the Commission except conduct hearings and determine disposition of the matter. *Id.* § 43(1). A referee is "empowered to conduct hearings, administer oaths or affirmations, subpoena witnesses, compel their attendance, examine them under oath or affirmation and require the production of any books, records, documents or other evidence that the referee may deem relevant or material to the subject of the hearing." *Id.* § 43(2).

In the course of an investigation the appearance of the involved judge may be required upon written notice. *Id.* § 44(3). The judge has a right to representation by counsel and to present evidence. *Id.* A transcript is made of any testimony or statements made under oath and the judge

---

tion of Codes, Rules & Regulations of the State of New York are identical except that the Preamble appears only in the Code of Judicial Conduct. For simplification they are referenced generally as the "Rules" or specifically as "22 NYCRR § xx."

4. The Standard Operating Procedures and Rules of the State Commission on Judicial Conduct are set forth in N.Y. Comp.Codes R. & Regs. tit. 22 § 7000 (McKinney's 2003 New York Rules of Court) (hereinafter 22 NYCRR § 7000).

may obtain a copy of the transcript free of charge. *Id.*

If the Commission determines in the course of its investigation that a hearing is warranted, a formal written complaint must be served upon the involved judge. *Id.* § 44(4). The judge must file a written answer within twenty days. *Id.* The judge is entitled to copies, without charge, of all documents the Commission intends to present at the hearing and any written statements made by witnesses the Commission intends to call. *Id.* The judge is also entitled to any relevant exculpatory material. *Id.*

The hearing is not public unless the judge makes a written demand. *Id.* The involved judge has a right to be represented by counsel, to cross-examine the Commission's witnesses, and to present relevant evidence and witnesses. *Id.* A transcript is made of the hearing and kept with the Commission records. *Id.*

Alternatively, a hearing may be waived upon an agreement on a statement of facts, subject to the approval of the Commission. *Id.* § 44(5). If the hearing is waived, then the Commission makes its determination based upon the formal written complaint, the judge's answer, and the agreed statement of facts. *Id.*

If a referee has conducted the investigation and hearing, the Commission considers the referee's report and recommendation and determines whether misconduct has been established. 22 NYCRR § 7000.7. The Commission provides an opportunity for the submission of briefs and oral argument regarding the report and recommended sanctions. *Id.*

At any time after a formal written complaint is issued the Commission determines that no further action is required, it must dismiss the complaint and notify the judge of the dismissal. N.Y. Jud. L. § 44(6).

The Commission may determine, after a hearing, that the involved judge be admonished, censured, removed, or retired. *Id.* § 44(7). The Commission may, in the alternative, determine that the misconduct does not warrant those sanctions and instead issue "a letter of caution containing confidential comments, suggestions and recommendations with respect to the formal written complaint." 22 NYCRR § 7000.7.

The Commission must forward its written determination that a prescribed sanction is appropriate along with findings of fact, conclusions of law, and the record of the proceedings, to the Chief Judge of the Court of Appeals. N.Y. Jud. L. § 44(7). A copy must also be served upon the involved judge. *Id.* Upon completion of service, the determination, findings of fact, conclusions of law, and record of proceedings become public. *Id.* The judge may accept the determination or make a written request for review to the Chief Judge. *Id.*

If the determination is admonishment or censure and the judge accepts it or fails to request a review then the Commission will issue the admonishment or censure. *Id.* If the determination is removal or retirement and the judge accepts it or fails to request a review then the Court of Appeals orders the removal or retirement. *Id.*

Upon acceptance of review by the Chief Judge, the Court of Appeals reviews the Commission's findings of fact and conclusions of law on the record of the Commission proceedings. *Id.* § 44(9). The record to be reviewed consists at a minimum of

all complaints, whether formal or informal or merely initiatory, except that [the involved judge] or the Commission may apply to the court for good cause shown to exclude irrelevant initiatory material;

any answer or other pleading or an agreed statement of facts; and the written determination, findings and conclusions and record of proceedings upon which the determination is based, including all record and documentary evidence or material before the Commission in the making of its determination.

22 NYCRR § 530.2. The involved judge must file a brief as well as the record for review. *Id.* The Commission must also file a brief, and the involved judge may file a reply brief. *Id.* At the conclusion of its review the Court of Appeals may accept or reject the sanction determined appropriate by the Commission, impose a different sanction, or impose no sanction. N.Y. Jud. L. § 44(9).

## IV. *THE COMPLAINT AND SUPPLEMENTAL COMPLAINT AGAINST SPARGO*

The Complaint and the Supplemental Complaint allege five specific charges of misconduct against Spargo. He answered denying the material allegations of violations and asserted that his conduct was protected by the United States and New York State Constitutions.

Note that whether Spargo actually engaged in the conduct alleged to violate the Rules is irrelevant for the purpose of this decision. It is also irrelevant to this decision, if Spargo did engage in the conduct, whether such conduct constituted a violation of the Rules. No opinion is offered as to whether the alleged activity of Spargo, if true, would bring disrespect to the judiciary.

### A. *Charge 1*

Charge 1 alleges violations of sections 100.1, 100.2(A), and 100.5(A)(4)(a) of the Rules, as follows:

[Spargo] failed to observe high standards of conduct ...; failed to avoid impropriety and the appearance of impropriety, failed to respect and comply with the law and failed to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary ...; and, as a candidate for judicial office, failed to maintain the dignity appropriate to judicial office and to act in a manner consistent with the integrity and independence of the judiciary ....

(Kunz Aff. Oct. 16, 2002, Ex. A ¶ 7.) These allegations of violations are based upon several events that occurred in October and November 1999 while Spargo was campaigning for the election of Justice of the Berne Town Court.

It is alleged that Spargo offered items of value to induce votes on his behalf. Specifically, the allegations are that on two occasions Spargo handed out coupons that could be redeemed for free donuts and coffee in a local convenience store; on one occasion he distributed coupons redeemable for $5.00 in gasoline to the first five motorists who drove up to a local convenience store; on four or five occasions, he introduced himself as a candidate for Town Justice and purchased a round of drinks for everyone at the bar of a local restaurant; on several occasions he introduced himself as a candidate for Town Justice and handed out fifty half-gallons of cider and donuts to town residents at the town dump; on several occasions he gave pizzas to teachers at a local school, town highway personnel, town barn personnel, school bus garage personnel, and patrons of a local store. The total value of the items given away is estimated to be $2,000.00.

### B. *Charge 2*

Charge 2 alleges violations of sections 100.1, 100.2(A), 100.2(C), 100.3(E)(1), and

100.4(D)(1)(a)-(c),[5] as follows:

> [Spargo] failed to observe high standards of conduct ...; failed to avoid impropriety and the appearance of impropriety, failed to respect and comply with the law and failed to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary ...; conveyed the impression that the District Attorney was in a special position to influence the judge ...; failed to disqualify himself in proceedings in which the judge's impartiality might reasonably be questioned ...; and engaged in financial and business dealings that may reasonably be perceived to exploit the judge's judicial position and involve the judge in a continuing business relationship with an attorney likely to come before the court ....

(Kunz Aff. Oct. 16, 2002, Ex. A ¶ 10.) These allegations are based upon Spargo presiding as Town Justice over criminal cases from the fall of 2000 through August 2001 that were prosecuted by the Albany County District Attorney's Office without making certain disclosures and obtaining a remittal of disqualification. Specifically, it is alleged that Spargo should have disclosed to the defense that he had represented the campaign of the District Attorney-elect and that the campaign owed him $10,000 for the legal services rendered.

### C. *Charge 3*

Charge 3 alleges violations of sections 100.1, 100.2, and 100.5(A)(1)(c), (d), (e), as follows:

> [Spargo] failed to observe high standards of conduct ...; failed to avoid impropriety and the appearance of impropriety and failed to act at all times in a manner that promotes public confi-

dence in the integrity and impartiality of the judiciary ...; engaged in partisan political activity ...; participated in a campaign for political office other than his own ...; and publicly endorsed other candidates for political office ....

(Kunz Aff. Oct. 16, 2002, Ex. A. ¶ 13.) The basis for this charge is that Spargo, while Town Justice, allegedly attended governmental sessions for the recount of presidential votes in Miami–Dade County, Broward County, and Palm Beach, Florida, as an observer for the Republican Party and the George Bush/Richard Cheney presidential campaign. The Commission further alleges that "with the aim of disrupting the recount process, [Spargo] participated in a loud and obstructive demonstration against the recount process outside the offices of the Miami–Dade County Board of Elections." *Id.* ¶ 11.

### D. *Charge 4*

Charge 4 alleges violations of sections 100.1, 100.2(A), and 100.5(A)(1)(c), (d), (f), (g), as follows:

> [Spargo] failed to observe high standards of conduct ...; failed to avoid impropriety and the appearance of impropriety and failed to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary ...; engaged in partisan political activity ...; permitted his name to be used in connection with the activities of a political organization ...; made a speech on behalf of a political organization ...; and attended a political gathering ....

(Kunz Aff. Oct. 16, 2002, Ex. A. ¶ 15.) This charge stems from Spargo allegedly attending a fund-raising event, the 39th Annual Monroe County Conservative Party Dinner, on May 18, 2001, and serving as

---

**5.** Note that Spargo does not challenge the constitutionality of sections 100.2(C), 100.3(E)(1), and 100.4(D)(1)(a)-(c) with regard to Charge 2.

keynote speaker at that event, while he was a Town Justice and Candidate for Supreme Court Justice.

### E. *Supplemental Charge*

The supplemental charge alleges violations of sections 100.1, 100.2(A), and 100.5(A)(4)(a), as follows:

> [Spargo] failed to observe high standards of conduct ...; failed to avoid impropriety and the appearance of impropriety, failed to respect and comply with the law and failed to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary ...; as a candidate for judicial office, [Spargo] failed to maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary ...; and [Spargo] conveyed the appearance that he paid Ms. McNally and Mr. Connolly for their efforts to obtain his nomination for public office, in violation of Section 158(3) of the Election Law ....

(Kunz Aff. Oct. 16, 2002, Ex. C ¶ 7.) This charge is based upon payments allegedly made by Spargo's judicial campaign committee to consultants involved in his campaign for Supreme Court Justice. Specifically, $5,000 was allegedly paid to McNally, who nominated Spargo as the Democratic Party's candidate for Supreme Court Justice although McNally had volunteered her services, did not expect to be paid, and did not request payment. A campaign disclosure statement listed the $5,000 debt to McNally as being owed for consulting services incurred on the same date as McNally made the nomination. It is further alleged that $5,000 was paid to a consulting firm, the principal of which was chair of the Rensselaer County Independence Party and a delegate to the Independence Party Judicial Nominating Convention and had sup-ported and worked for Spargo's nomination as the Independence Party candidate, although there was no legal obligation to make such payment.

## V. CHALLENGED CODE PROVISIONS

Spargo challenges the constitutionality of sections 100.1, 100.2(A), 100.5(A)(1)(c), (d), (e), (f), (g), and 100.5(A)(4)(a) of the Rules. The challenged provisions are set forth below.

> § 100.1 A Judge Shall Uphold the Integrity and Independence of the Judiciary

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Part 100 are to be construed and applied to further that objective.

> § 100.2 A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities

(A) A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary ....

> § 100.5 A Judge or Candidate for Elective Judicial Office Shall Refrain From Inappropriate Political Activity

(A) Incumbent Judges and Others Running for Public Election to Judicial Office.

(1) Neither a sitting judge nor a candidate for public election to judicial office shall directly or indirectly engage in any political activity except (i) as otherwise authorized by this section or by law, (ii) to vote and to identify himself or herself as a member of a political party,

and (iii) on behalf of measures to improve the law, the legal system or the administration of justice. Prohibited political activity shall include:

. . . . .

(c) engaging in any partisan political activity, provided that nothing in this section shall prohibit a judge or candidate from participating in his or her own campaign for elective judicial office or shall restrict a non-judge holder of public office in the exercise of the functions of that office;

(d) participating in any political campaign for any office or permitting his or her name to be used in connection with any activity of a political organization;

(e) publicly endorsing or publicly opposing (other than by running against) another candidate for public office;

(f) making speeches on behalf of a political organization or another candidate;

(g) attending political gatherings;

. . . . .

(4) A judge or a non-judge who is a candidate for public election to judicial office:

(a) shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary, and shall encourage members of the candidate's family to adhere to the same standards of political conduct in support of the candidate as apply to the candidate;

. . . . .

22 NYCRR §§ 100.1 to 100.5.

## VI. DISCUSSION

### A. Abstention

Defendants contend that as a matter of law their affirmative defense of abstention has been demonstrated. Plaintiffs argue that abstention is inappropriate because their federal constitutional claims cannot be adequately addressed in the proceeding pending before the Commission.

There is "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (citing *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). There is a three-prong test to determine whether a federal court should abstain pursuant to the *Younger* doctrine. *See id.* at 432, 102 S.Ct. at 2521. First, the state proceeding must be judicial in nature. *Id.* at 433–34, 102 S.Ct. at 2522. Second, an important state interest must be implicated by the proceeding. *Id.* at 434, 102 S.Ct. at 2522. Finally, the constitutional claims must be determinable in the state proceeding. *Id.* at 435, 102 S.Ct. at 2523. If all three prongs are affirmative, then the federal court must abstain unless there is a "showing of bad faith, harassment, or other extraordinary circumstances that would make abstention inappropriate." *Id.* at 436, 102 S.Ct. at 2523.[6]

McNally and Kermani are not judges or judicial candidates and therefore are not subject to the Commission's authority. Accordingly, their constitutional claims cannot be determined in the Commission proceeding to which they are not parties. Defendants contended at oral argument that derivative claims, such as those brought by McNally and Kermani,

---

6. Plaintiffs make no claim that the Commission proceeding is not judicial in nature, does not implicate an important state interest, or that there is bad faith, harassment, or other extraordinary circumstances.

are not cognizable in an action brought under section 1983. *See Jackson v. Johnson,* 118 F.Supp.2d 278, 286 (N.D.N.Y. 2000), *aff'd in part & dismissed in part,* 13 Fed.Appx. 51 (2d Cir.2001). However, McNally and Kermani each assert individual claims that the challenged sections of the Rules chill their individual speech and association and are therefore unconstitutional. *See Steffel v. Thompson,* 415 U.S. 452, 474–75, 94 S.Ct. 1209, 1223–24, 39 L.Ed.2d 505 (1974) (holding that on its face or as applied challenge will lie although there is no pending state court proceeding).[7] Therefore, abstention is not appropriate as to McNally and Kermani.

■ The only abstention issue with regard to Spargo is whether the misconduct proceedings before the Commission afford an adequate opportunity to determine the constitutional challenges.[8] The Commission has authority to "receive, initiate, investigate, and hear complaints regarding the conduct, qualifications, and performance of [state court] judges." N.Y. Const. Art. 6 § 22. By its plain language the Commission's authority does not include entertaining constitutional challenges to the Rules.

Defendants contend that a judge or judicial candidate facing misconduct charges may raise unconstitutionality as a defense, thus bringing a constitutional issue within the purview of the Commission. While at first glance this seems plausible, further consideration reveals several difficulties.

First, if charges are lodged but are later found to be unsubstantiated, or for any other reason the Commission determines not to proceed, the complaint is dismissed. *See* N.Y. Jud. L. § 44(6). Upon dismissal of a complaint, the record and all relevant materials would remain sealed. *See id.* §§ 44–45. The purported offender's constitutional challenge would go unheard.

Second, the assertion that there is necessarily a review of any Commission finding by the Court of Appeals is debatable.[9] There is a provision that upon an adverse determination by the Commission the judge "may ... make written request to the chief judge [of the court of appeals]... for a review." *Id.* § 44(7). It is further provided that "in its review of a determination of the commission, the court of appeals shall review the commission's" findings and determination. *Id.* § 44(9). Defendants rely upon the "shall review" language in support of their reading that review is mandatory. However, the language is not so clear that it could not be read to the contrary, that is, that review is discretionary rather than mandatory. Use of the phrase "may ... request" indicates that the Chief Judge can

---

7. Defendants have not challenged the standing of McNally and Kermani to bring a direct (as opposed to derivative) constitutional challenge to the specified Rules. Their facial challenge to the specified Rules will lie since they have asserted that enforcement of the Rules has chilled their right to free speech and association. *See id.*

8. Defendants' sole argument in this regard is that the Commission proceedings, and any appeal from the Commission's determination, provide Spargo an adequate opportunity to determine the constitutional issues. They do not argue that there is any other state proceeding, such as Article 78, that would provide plaintiffs with a judicial proceeding in which their constitutional claims could be determined.

9. It is noted that the question whether a challenge to a disciplinary determination is as of right or discretionary may be more properly answered by the New York Court of Appeals. However, there is no provision for a District Court to certify such a question to the state's highest court. *See* McKinney's New York Rules of Court § 500.17(b) (2003) (permitting United States Court of Appeals to certify dispositive question of law to the New York Court of Appeals).

grant or deny the request. In common usage, when there is a request it is not automatically granted; it may be denied. The following scenario is well within the language of the provision. A judge, disagreeing with the Commission, makes a written request to the Chief Judge for a review. The Chief Judge denies the request. The Court of Appeals has no review before it so the provision that "in its review of a determination of the commission, the court of appeals shall review" is not offended. Only *if* the Chief Judge granted the request for review *must* the full court review the Commission's findings and determination.

No case law has been cited to support defendants' reading that review is mandatory. Moreover, the Court of Appeals is limited to "review the commission's findings of fact and conclusions of law *on the record of the proceedings* upon which the commission's determination was based." N.Y. Jud. L. § 44(9) (emphasis added). The Commission's findings of fact consist of what conduct did occur. The conclusions of law consist of an application of the Rules to the facts as found to determine if the conduct violated the Rules. Consideration of the validity of the Rules themselves is outside the scope of the Commission's authority despite any constitutional defense brought by the judge.

Further, the record of the Commission is made in the course of its investigation. (Kunz Aff. Nov. 25, 2002, Ex. A at 2.) Any hearing is not a trial, and rules of evidence do not apply. *Id.* The resultant record would necessarily be spare, less than ideal for consideration of a constitutional question of import not only statewide but nationwide as well. Additionally, where, as here, the constitutional challenges are summarily rejected or ignored, without analysis or discussion, *see id.* Ex. B, a full review of the constitutional questions would be impossible because of the scant record. *See In re Shaw,* 96 N.Y.2d 7, 12, 724 N.Y.S.2d 672, 747 N.E.2d 1272 (2001) (per curiam) (reiterating that upon review of Commission's determination, court is limited to the record at the time of the determination).

The Commission proceedings against Elizabeth Shanley ("Shanley") and her subsequent appeal illustrate this point. Misconduct charges were brought against Shanley regarding her campaign for election as a Town Justice in the Town of Esopus, in Ulster County, New York. *In re Shanley,* 98 N.Y.2d 310, 311, 746 N.Y.S.2d 670, 774 N.E.2d 735 (N.Y.2002) (per curiam). Ms. Shanley had campaigned as a "law and order" candidate, which the Commission found objectionable.[10] *Id.* at 312, 746 N.Y.S.2d 670, 774 N.E.2d 735. She challenged the misconduct charges on the basis of her First Amendment right to free speech. (Pisani Aff. ¶¶ 3–4.) The Commission found that her conduct violated sections 100.1, 100.2(A),[11] 100.5(A)(4)(d)(i)-(ii) and admonished her. In the Matter of Elizabeth A. Shanley, (Dec. 27, 2001), http:// www.scjc.state.ny.us/shanley.htm. The Commission made findings of fact and conclusions of law, never mentioning Shanley's constitutional challenge. *Id.* Upon review, the Court of Appeals found that Shanley's conduct did not offend the Rules, again without mention of her First Amendment challenge. *In re Shanley,* 98 N.Y.2d at 312, 746 N.Y.S.2d 670, 774 N.E.2d 735.

---

10. She also distributed campaign literature that was misleading regarding her educational credentials. *Id.* at 311. That conduct was not subject to constitutional challenge and therefore is not discussed further.

11. Sections 100.1 and 100.2(A) are two of the sections challenged in this action.

Thus, Shanley's constitutional challenge on First Amendment grounds went undetermined.

Third, it appears that the Court of Appeals has never undertaken a constitutional challenge to the Rules on review of a Commission determination. Defendants cite *Nicholson v. State Comm'n on Judicial Conduct*, 50 N.Y.2d 597, 431 N.Y.S.2d 340, 409 N.E.2d 818 (1980) (per curiam), as a case in which the Court of Appeals addressed constitutional issues. However, *Nicholson* involved a challenge to the Commission's authority to investigate the conduct of a judicial candidate/judge. *Id.* at 603, 431 N.Y.S.2d 340, 409 N.E.2d 818. Nicholson, the former campaign manager for the judge being investigated, moved to quash a subpoena issued to him. *Id.* at 603–04, 431 N.Y.S.2d 340, 409 N.E.2d 818. Other former campaign workers were also subpoenaed. *Id.* at 604, 431 N.Y.S.2d 340, 409 N.E.2d 818. The Commission moved to compel the other campaign workers to comply with the subpoenas. *Id.* at 605, 431 N.Y.S.2d 340, 409 N.E.2d 818. Nicholson and the others also brought a Writ of Prohibition seeking to enjoin the Commission from continuing the investigation. *Id.* at 605, 431 N.Y.S.2d 340, 409 N.E.2d 818. The court first determined that seeking a Writ of Prohibition in an Article 78 proceeding was proper. *Id.* at 606–07, 431 N.Y.S.2d 340, 409 N.E.2d 818. The *Nicholson* Court then turned to the merits and found that although a chilling of freedom of speech and association may occur, the state interest in the integrity and impartiality of the judiciary was overriding thus the Commission could investigate misconduct by the judiciary. *Id.* at 608–10, 431 N.Y.S.2d 340, 409 N.E.2d 818. In other words, the Constitution did not pre-clude an investigation of improper fund raising and judicial favoritism.

*Nicholson* thus presented a very different procedural posture than what is presented in the instant case.[12] Rather than reaching the constitutional question in the course of the disciplinary proceeding, the question was addressed in the context of an Article 78 proceeding. *See* 50 N.Y.2d at 610, 431 N.Y.S.2d 340, 409 N.E.2d 818. The *Nicholson* Court merely found that an investigation into judicial misconduct was constitutional. *Id.* It did not consider a constitutional challenge to the Rules in the context of a disciplinary proceeding. Therefore it provides no support for the assertion that the Court of Appeals has considered such a constitutional challenge.

Defendants have not cited any other cases in which the Court of Appeals (or for that matter the Commission) has undertaken analysis of a constitutional challenge to either the Rules in general or to any specific Rules, and none have been found. It is fallacious to argue that abstention is appropriate because plaintiffs necessarily have an opportunity to be heard in state proceedings, when in the history of state court proceedings no such claim has ever been heard.

Accordingly, because plaintiffs do not have an adequate opportunity to have their constitutional claims determined in the state disciplinary proceeding, abstention is not appropriate or necessary.

**B. *Equal Protection***

 A state may not deny a person equal protection of the laws. U.S. Const. amend. XIV, § 1. Similarly situated persons must be treated alike. *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d

---

**12.** Here the plaintiffs are challenging specific Rules and not the right of the Commission to investigate and discipline. In fact, the plain-tiffs concede that the Commission has the authority to proceed with Charge 2 regardless of this decision. (*See* Tr. at 16–17.)

Cir.1995). At issue here are the restrictions placed upon candidates for judicial office. No such restrictions are placed upon candidates for other public offices.

Unlike other public offices, the judiciary must independently, fairly, and competently interpret and apply the laws of the state. *See* N.Y. Judiciary Law, Code of Judicial Conduct, Preface (McKinney's Supp.2003). The judicial office is a public trust that must be respected and honored. *See id.*

> There is a critical difference between the work of a judge and the work of other public officials. In a democracy, issues of policy are properly decided by majority vote; it is the business of legislators and executives to be popular. But in litigation, issues of law or fact should not be determined by popular vote; it is the business of judges to be indifferent to unpopularity.

*Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 2547, 153 L.Ed.2d 694 (2002) (Stevens, J., dissenting). An important consideration in a judicial campaign, absent from campaigns for other public office, is remaining free from bias or preconceived determinations that may endure upon assuming the bench. *See id.* at 2542 (O'Connor, J., concurring) (discussing the difficulty of maintaining impartiality with an elected judiciary).

Judicial candidates and candidates for other public office are not similarly situated. Accordingly, treating them differently is constitutionally permissible. The restrictions placed upon judges and judicial candidates do not deny them equal protection of the laws.

## C. *Applicability of § 1983*

■ Defendants argue that plaintiffs' section 1983 claims must be dismissed

against the Commission and the individual defendants in their official capacities due to Eleventh Amendment immunity. Suits against the state generally are barred by the Eleventh Amendment. *Estes–El v. Town of Indian Lake*, 954 F.Supp. 527, 536 (N.D.N.Y.1997). However, declaratory and prospective injunctive relief are available. *Kostok v. Thomas*, 105 F.3d 65, 69 (2d Cir.1997). Plaintiffs' claims brought under 42 U.S.C. § 1983 need not be dismissed.

## D. *First Amendment*

Plaintiffs challenge sections 100.1, 100.2(A), 100.5(A)(1)(c)-(g), and 100.5(A)(4)(a) as impermissible prior restraints.[13] They further contend that all of the challenged sections are unconstitutionally vague. They challenge sections 100.5(A)(1)(d)-(f) as unconstitutionally overbroad. Defendants argue that the specified sections constitute permissible prior restraints and are not unconstitutionally vague or overbroad.

### 1. *Prior Restraint*

The parties agree that sections 100.5(A)(1)(c)-(g), and 100.5(A)(4)(a) constitute a prior restraint. The issue is whether this prior restraint on political activity is constitutionally permissible.

■ A prior restraint on protected speech " 'bear[s] a heavy presumption against its constitutional validity.' " *Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1120 (1st Cir.1981) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975)). Such a prior restraint is constitutionally permissible only if it is narrowly tailored to serve a compel-

---

**13.** While plaintiffs contend that all challenged sections constitute impermissible prior re-

straints, sections 100.1 and 100.2(A) are more properly evaluated for vagueness.

ling state interest. *White*, 122 S.Ct. at 2534. A prior restraint is narrowly tailored where "it does not 'unnecessarily circumscrib[e] protected expression.'" *Id.* at 2535 (quoting *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S.Ct. 1523, 1529, 71 L.Ed.2d 732 (1982)). Defendants bear the burden of demonstrating that the interest is compelling and that it is narrowly tailored. *See id.* at 2534–35.

Defendants assert that the state interest to be served is an independent judiciary. (*See* Tr. at 52–54.) Defendants distinguish independence from impartiality, the asserted justification for the prior restraint in *White*. *Id.* at 54.

In *White*, a Minnesota provision prohibiting judicial candidates from announcing "'views on disputed legal or political issues'" was at issue. 122 S.Ct. at 2531 (quoting Minn.Code of Judicial Conduct, Canon 5(A)(3)(d)(i) (2000)). After reciting the strict scrutiny standard for application in cases of prior restraint of protected speech, the Court determined the meaning of impartiality. *Id.* at 2534–35.

The Court first looked to a dictionary to find that in this context impartiality could mean "the lack of bias for or against either *party*," assuring "equal application of the law." *Id.* at 2535. The Court noted that while the lower appellate court also referenced the interest in an "independent" judiciary, the parties appeared to use the terms independent and impartial interchangeably. *Id.* at 2535 n. 6. When applying strict scrutiny, the Court found that the announce clause was not narrowly tailored to serve impartiality in the sense of bias for or against a party. *Id.* at 2535. Rather, the announce clause restricted speech regarding *issues*. *Id.*

The Court then conceded that another possible, albeit uncommon, meaning of impartial in this context could be "lack of preconception in favor of or against a par-

ticular *legal view.*" *Id.* at 2536. The announce clause was an impermissible prior restraint using this meaning because "avoiding judicial preconceptions on legal issues is neither possible nor desirable, [and] pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest either." *Id.*

Finally the Court examined a third possible, also uncommon, meaning of impartial, open-mindedness. *Id.* The Court rejected respondents' argument that the announce clause was put in place to assure the open-mindedness of the judiciary. *Id.*

Here defendants do not suggest what they mean by "independent judiciary." They merely assert that maintaining an "independent judiciary" is a compelling state interest served by the sections of the code of conduct at issue.

Plaintiffs seem to consider the articulated purpose of judicial independence as a compelling state interest. Accordingly, it will be accepted as such. Next it must be determined exactly what is meant by judicial independence, and if the challenged sections of the Rules are narrowly tailored to achieve it. *See id.* at 2535.

### a. *Judicial Independence*

According to Black's, independent means "[n]ot subject to the control or influence of another." Black's Law Dictionary 774 (7th ed.1999). A secondary meaning is "[n]ot associated with another (often larger) entity." *Id.* A tertiary meaning is "[n]ot dependent or contingent on something else." *Id.* The Preamble to the Rules may also be instructive. It avers that the Rules "be construed so as not to impinge on the essential independence of judges in making judicial decisions." The Preamble language indicates that in

this context independence means outside the control or influence of another. It cannot mean not associated with a larger entity, such as a political party, because that is contrary to a system of partisan elections. It also cannot mean contingent upon something else, in this context.

In other words, the compelling state interest purportedly served by the Rules is to preserve judicial independence, that is, the ability of judges to make their decisions free of the control or influence of other persons or entities.

### b. *Political Activity*

 Section 100.5(A), applicable to judges and judicial candidates, generally prohibits "inappropriate political activity." The challenged subdivisions more specifically prohibit engaging in partisan political activity except with regard to the candidate's own campaign, participating in a political campaign or using the judge's name in a campaign, endorsing or opposing any candidate, giving speeches on behalf of political organizations or candidates, and attending political gatherings. 22 NYCRR §§ 100.5(A)(1)(c)-(g). Further, section 100.5(A)(4)(a) directs candidates to "maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary, and [ ]encourage members of the candidate's family to adhere to the same standards of political conduct in support of the candidate as apply to the candidate." Essentially these Rules prohibit judges and judicial candidates from any political activity except their own judicial campaign.

Defendants do not suggest how avoiding the delineated "inappropriate" conduct furthers the goal of maintaining the independence of the judiciary. The only conceivable connection would be that engaging in political activity, whether partisan or non-

partisan, would influence a judge's decision toward or against the view espoused, whether it be on an issue of law or as to a party to a proceeding. In other words, engaging in political activity would create a bias either for or against an issue of law or a party thus undermining the judge's independence. In that context, the Rules prohibiting participation in political activities would prevent bias, leading to the ultimate goal of preserving judicial independence. Even if this attenuated connection was valid, it does not save the Rules.

The United States Supreme Court has determined that a rule prohibiting announcing views on disputed legal or political issues is not narrowly tailored to serve the compelling interest of a judiciary free from bias. *White*, 122 S.Ct. at 2535. Here the prohibitions are even broader than prohibiting specific speech, such as views on legal or political issues as in *White*. Again, here judges and judicial candidates are essentially precluded from participating in politics at all except to participate in their own election campaigns. Moreover, a wholesale prohibition on participating in political activity for fear of influencing a judge ignores the fact that a judicial candidate must have at one time participated in politics or would not find him or herself in the position of a candidate. *See id.* at 2536–37 (noting that lawyers who have preconceived views on legal issues before becoming judges are experienced rather than biased; one with no preconceived ideas would be unqualified). There is no support for the proposition that one-time participation in political activity impedes the making of independent judgments any less than current participation in some political activity might.

Moreover, if a judge were influenced, or biased, against or for a party to a proceeding, for political reasons or otherwise, the proper consequence would be recusal. To

demonstrate this principal, imagine a lawyer becoming good friends with her neighbor. The lawyer becomes a judge, and the friendship continues. The neighbor inherits property that is contaminated with hazardous substances. An action to recover clean-up costs is initiated, naming the neighbor as a defendant. This judge is assigned the case. Because she is friends with one of the named defendants, she recuses herself. Perfectly appropriate. A rule prohibiting judges (or judicial candidates) from being friends with their neighbors would not narrowly serve the state's interest in an independent judiciary. Likewise, a rule prohibiting an elected judge or judicial candidate from participating in politics is not narrowly tailored to serve the state's interest in an independent judiciary. This is particularly true in light of the political process by which judges are elected. *See generally id.* at 2542–44 (O'Connor, J., concurring) (criticizing the elective method of selecting judges.)

### c. *Tradition*

Defendants urge that a " 'long-established' tradition of prohibiting certain conduct," such as political activity by judges and judicial candidates, "creates 'a strong presumption' that the prohibition is constitutional." *See id.* at 2540. Defendants assert that the Code of Judicial Conduct was first adopted in New York in 1909, thus standing as a long-established tradition. (Defts.' Mem. at 20.) No authority is cited.[14] Defendants go so far as to state that "New York stands as an exception to the general conclusion of the Supreme Court that codes for regulating judicial conduct did not begin to develop until the latter half of the 20th century. *White,* 122 S.Ct. at 2540." *Id.*

This assertion is more than misleading; it is inaccurate. In fact, the Supreme Court was completely correct in stating that codes of judicial conduct were first developed in the latter half of the twentieth century. *See Judicial Conduct and Ethics, supra,* § 1.03. In 1924 the ABA first adopted Canons of Judicial Ethics "as a guide and reminder for judges, indicating what the people have a right to expect from them." Lisa L. Milord, American Bar Association, *The Development of the ABA Judicial Code* 132 (1992). New York created a special court in 1947 to consider and sanction judicial misconduct, but it was ineffectual. *Judicial Conduct and Ethics, supra,* § 1.03. It was not until 1972 that a Code of Conduct meant to be enforceable was promulgated. *Id.* § 1.02. In 1973, New York adopted the ABA's Model Code of Judicial Conduct, with some modifications. Gross, *supra.* There was no effective method of enforcing the Code until the constitutional changes that created the Commission on Judicial Conduct. N.Y. Const. Art. 6 § 22. Thus, there is not a long-standing tradition of effectively regulating judicial conduct. Further, when long-standing tradition of prohibiting conduct creating a presumption of constitutionality is discussed, it is done in the context of whether a certain prohibition would have been considered constitutional (or not) at the time of the framing, or historically, *see, e.g., White,* 122 S.Ct. at 2540; *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 341–43, 115 S.Ct. 1511, 1516–17, 131 L.Ed.2d 426 (1995), and not just in the recent past.

In sum, there is no long-standing tradition to create a presumption of constitutionality in this case. Even if there were such a presumption, that would have to be

---

14. Actually, the New York Judiciary Law itself was enacted in 1909. 3 Birdseye's Cumming & Gilbert Consolidated Laws of New York 2713 (1909). However, no code of judicial conduct is incorporated or appended.

considered in light of the core First Amendment speech at issue here. "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs" including "uninhibited, robust, and wide-open" debate on candidate and issue-based elections. *McIntyre*, 514 U.S. at 346–47, 115 S.Ct. at 1519. Thus, even in the face of any tradition, a restriction on the core right to make political speech must be narrowly tailored to meet a compelling state interest. *Id.* at 347, 115 S.Ct. at 1519 (stating that a restriction on core political speech will be upheld "only if it is narrowly tailored to serve an overriding state interest"). The burden on the core political speech of judges and judicial candidates imposed by these sections of the Code of Judicial Conduct are not narrowly tailored to serve an overriding state interest.

Sections 100.5(A)(1)(c)-(g) and 100.5(A)(4)(a) are void as impermissible prior restraints upon the rights guaranteed by the First Amendment.[15]

### 2. *Vagueness*

■ Sections 100.1 and 100.2(A) are affirmative directives to judges which are designed to preserve an honorable, independent, and impartial judiciary. The issue is whether such general guides may form the basis for specific formal charges against a judge.

"[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). First, a rule must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id.*, 92 S.Ct. at 2298–99. Second, a rule

must have specific standards so that those who enforce it cannot do so arbitrarily and discriminatorily. *Id.* at 108–09, 92 S.Ct. at 2299. Third, a rule that impedes basic First Amendment freedoms, if vague, leads those whose conduct is affected to more severely limit their conduct in order to avoid a violation. *Id.* at 109, 92 S.Ct. at 2299.

Section 100.1 requires a judge to "uphold the integrity and independence of the judiciary." Further, the "judge should participate in establishing, maintaining and enforcing high standards of conduct, and [ ] personally observe those standards so that the integrity and independence of the judiciary will be preserved." 22 NYCRR § 100.1. First, the language of this rule provides no reasonable opportunity for a person of any level of intelligence to know what conduct would be prohibited. *See Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298–99. In fact, each of the charges of misconduct lodged against Spargo, ranging from handing out donuts to attending the Florida presidential election recounts to making improper payments for nominations, includes an alleged violation of § 100.1.

Second, section 100.1 completely lacks specificity. *See Grayned*, 408 U.S. at 108–09, 92 S.Ct. at 2299. The Commission may exercise complete discretion when determining what conduct fails to "uphold the integrity and independence of the judiciary." There is no objective standard upon which to evaluate what conduct violates the provision, or, for that matter, what conduct is sufficient to meet its directive of upholding integrity and independence. Certainly one could identify conduct that would plainly denigrate the integrity and independence of the judiciary, for example,

---

**15.** Plaintiffs also make an overbreadth challenge to sections 100.5(A)(1)(d)-(f). Given the finding that these sections constitute imper-

missible prior restraints, an overbreadth analysis is unnecessary.

murder and mayhem, or bribery. However, when faced with conduct short of the extreme, such as handing out donuts, it is a purely subjective determination by the Commission. Defendants characterize handing out donuts as "unseemly." They assert that Spargo's handing out donuts is different than serving coffee and cake at a reception where a candidate is introduced. How would anyone know that handing out donuts would constitute a failure to uphold the integrity and independence of the judiciary while serving cake would not? Finally, this broad directive would tend to lead judges to severely restrict their conduct, lest they be accused of failing to "uphold the integrity and independence of the judiciary."

■ Section 100.2(A) requires a judge to "respect and comply with the law and [ ]act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." A person of ordinary intelligence would undoubtedly know that this section forbids unlawful conduct. *See Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99. However, a person of ordinary intelligence could not know what conduct does or does not constitute acting "in a manner that promotes public confidence in the integrity and impartiality of the judiciary." *See id.* From reading this phrase there simply is no way to determine permissible and impermissible conduct, short of the extreme. Again,

each and every charge of misconduct against Spargo cites this provision which again demonstrates that the Commission's enforcement of this provision must be arbitrary and subjective, for lack of any specific, objective standards to apply. *See id.* at 108–09, 92 S.Ct. at 2299.

Defendants argue that Spargo cannot challenge these provisions as vague because they unquestionably apply to his conduct. *See Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974) (stating, "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness"). However, when the challenge is grounded in the First Amendment, there is an exception to this general principle that a facial challenge is precluded.[16] *Id.* at 759, 94 S.Ct. at 2563. Spargo's challenge is, of course, grounded in the First Amendment. Accordingly, a vagueness analysis is not precluded on this ground.

Sections 100.1 and 100.2(A) are void for vagueness.[17]

## VII. *CONCLUSION*

Abstention under the *Younger* doctrine is inappropriate because plaintiffs do not have an adequate opportunity to have their constitutional claims determined in the state court proceeding. *See Middlesex County Ethics Committee,* 457 U.S. at 434–35, 102 S.Ct. at 2522–23. The Elev-

---

**16.** Defendants citation to *Parker* in support of the proposition that Spargo is prohibited from a vagueness challenge is misleading. After stating the aforementioned principle and the First Amendment exception, the *Parker* Court found that the "weighty countervailing policies" that justified the exception in the civilian context were not present in the military context. *Id.* at 760–61, 94 S.Ct. at 2564. Accordingly, the Court found that since the conduct at issue clearly fell within the prohibition of the Uniform Code of Military Justice, plaintiff, a commissioned officer, could not

mount a vagueness challenge. *Id.* The Court did not find, as defendants suggest, that in the context of a civilian, such as Spargo, the general rule (rather than the exception) applies.

**17.** Plaintiffs challenge sections 100.5(A)(1)(c), 100.5(A)(1)(g) and 100.5(A)(4)(a) as void for vagueness. However, a vagueness analysis is unnecessary given the finding that sections 100.5(A)(1)(c)-(g) and 100.5(A)(4)(a) are invalid prior restraints.

enth Amendment does not preclude plaintiffs' claims for declaratory and injunctive relief pursuant to § 1983. The challenged sections of the Code of Judicial Conduct do not violate equal protection. Sections 100.5(A)(1)(c)-(g) and 100.5(A)(4)(a) are not narrowly tailored to serve a compelling state interest and therefore are void as invalid prior restraints upon plaintiffs' First Amendment rights. *See White*, 122 S.Ct. at 2534. Sections 100.1 and 100.2(A) are void for vagueness because they do not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, do not have specific standards, and lead judges and judicial candidates to more severely limit their conduct in order to avoid a violation. *See Grayned*, 408 U.S. at 108–09, 92 S.Ct. at 2298–99. The plaintiffs are entitled to a permanent injunction.

The effect of the permanent injunction is that the defendants may not proceed against Spargo on Charges 1, 3, 4, and the Supplemental Charge because those charges allege violations of only the void sections of the Rules. The defendants may proceed against Spargo on Charge 2 to the extent that the allegations are of violations of sections 100.2(C), 100.3(E)(1), and 100.4(D)(1)(a)-(c), which were not constitutionally challenged.

Accordingly, it is

ORDERED that

1. Sections 100.1, 100.2(A), 100.5(A)(1)(c)-(g), and 100.5(A)(4)(a) of the Code of Judicial Conduct appended to the New York Judiciary Law as set forth in the Rules of the Chief Administrator of the Courts and Title 22 of the Official Compilation of Codes, Rules & Regulations of the State of New York (N.Y.CRR) are facially unconstitutional; and

2. Defendants are PERMANENTLY ENJOINED and RESTRAINED from enforcing sections 100.1, 100.2(A), 100.5(A)(1)(c)-(g), and 100.5(A)(4)(a) of the Code of Judicial Conduct appended to the New York Judiciary Law as set forth in the Rules of the Chief Administrator of the Courts and Title 22 of the Official Compilation of Codes, Rules & Regulations of the State of New York (N.Y.CRR).

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.